**CHARIOT PLASTICS, INC. and Summit Metals, Inc. (successor by merger to Chariot Group, Inc.), Plaintiffs,**

v.

**UNITED STATES of America, Commissioner of Internal Revenue, and Revenue Officer Lawrence Randall, Defendants.**

**United States of America, Third–Party Plaintiff,**

v.

**Chariot Holdings, Inc., Hallowell Industries, Inc., and Energy Savings Products, Inc. (successor by merger to Homestar Acquisition, Corp.), Third–Party Defendants.**

No. 96 Civ. 4418 (DC).

United States District Court, S.D. New York.

Dec. 1, 1998.

Kostelanetz & Fink, LLP, Hallowell Industries, Inc., Energy Savings Products, Inc. (successor by merger to Homestar Acquisition, Corp.) by Brian C. Wille, New York City, for Plaintiffs and Third–Party Defendants.

Green & Seiftner, Attorneys, P.C., Chariot Holdings, Inc. by Paul M. Predmore, Syracuse NY, for Third–Party Defendant.

Mary Jo White, United States Attorney for the Southern District of New York by Sean C. Cenawood, Assistant United States Attorney, New York City, for Defendants and Third–Party Plaintiff.

## MEMORANDUM DECISION

CHIN, District Judge.

This action stems from attempts by the Internal Revenue Service (the "IRS") to collect outstanding taxes owed by Chariot Holdings, Inc. ("Chariot Holdings"). The government maintains that it is entitled to collect the amount due not only from Chariot Holdings, but also from other corporate entities either because they were part of a consolidated group on whose behalf Chariot Holdings filed corporate income tax returns, or alternatively, on the ground that they are nominees or alter egos of Chariot Holdings.

Plaintiffs and third-party defendants move for summary judgment on their claims against defendants and for dismissal of and/or summary judgment on defendants' counterclaims and third-party plaintiff's claims. Defendants and third-party plaintiff move for partial summary judgment. For the reasons stated below, plaintiffs' and third-party defendants' motions are denied in all respects and defendants' and third-party plaintiff's motion is granted in all respects.

## BACKGROUND

### A. The Tax Liabilities

For the 1984, 1985, and 1986 tax years, Chariot Holdings filed corporate income tax returns on a consolidated basis pursuant to 26 C.F.R. § 1.1502–77(a) on behalf of various companies. Chariot Group, Inc. ("Chariot Group"), the predecessor to plaintiff Summit Metals, Inc. ("Summit Metals"), was part of the consolidated group for each of these three tax years; plaintiff Chariot Plastics, Inc. ("Chariot Plastics") was included in the tax group for the 1986 tax year.

By a notice of deficiency to Chariot Holdings dated June 9, 1993, the government asserted deficiencies and penalties, including fraud penalties, against Chariot Holdings and members of the consolidated group, including Chariot Group and Chariot Plastics, for the 1984, 1985, and 1986 tax years. Ultimately, Richard Gray, on behalf of Chariot Holdings, agreed to a stipulated Tax Court decision dated November 22, 1994 pursuant to which deficiencies and penalties were assessed against Chariot Holdings on March 7, 1995. According to the government, the outstanding liability with accruals through January 5, 1998 totaled $6,978,217.38.

On March 7, 1995, the government sent a notice and demand for payment to Chariot Holdings for the 1984, 1985, and 1986 tax years. The government sent a notice and

demand for payment on August 21, 1995, to Chariot Group for the same tax years and to Chariot Plastics for the 1986 tax year. On August 16, 1995, the government filed a Notice of Federal Lien with the Secretary of State against Chariot Holdings. On August 24, 1995, the government filed similar liens against Chariot Group and Chariot Plastics.

On September 20, 1995, the government issued three Notices of Levy with respect to Chariot Group's tax liability. Pursuant to these notices, the government received $104,-179.32 from United Jersey Bank and $3,171.44 from Smith Barney, but no payment from Chemical Bank. The payments were applied to Chariot Holdings's tax debt. Also on September 20, 1995, the government issued Notices of Levy to Richardson, Mahon & Casey, P.C. with respect to the tax liability of Chariot Holding, Chariot Plastics, and Chariot Plastics as nominee for Chariot Holdings. In response to these notices, the government received certificates for 1,901,-362 shares of Chariot Group common stock.

### B. The Corporate Relationships

 Gray is the sole owner of Chariot Holdings. According to the government, Chariot Holdings wholly owns Chariot Plastics.[1] Chariot Plastics owned approximately 78% of Chariot Group.[2] Prior to June 30, 1995, Chariot Group owned approximately 92% of Energy Savings Products, Inc.

("ESP"), which wholly owns B.F. Rich, Inc. ("B.F.Rich"). Both ESP and B.F. Rich are operating companies engaged in the manufacture of windows and doors.

The government asserts that Gray is also the sole owner of third-party defendant Hallowell Industries, Inc. ("Hallowell"). Hallowell wholly owns Chariot Realty, Inc. ("Chariot Realty"), which wholly owned third-party defendant Homestar Acquisition Corp. ("Homestar") before Homestar's June 30, 1995 merger into ESP.

### C. Allegations of Fraudulent Conveyance and Defalcation by Gray

According to the government, Gray has used corporate entities that he controls to avoid paying tax assessments owed pursuant to the 1994 stipulated Tax Court decision. The government further contends that Gray has used the corporations to commit fraud.

From 1986 to 1990, Chariot Group was a public company with independent directors listed on the American Stock Exchange. Gray was the majority shareholder during this period. In 1990, Chariot Group was delisted from the American Stock Exchange and the independent directors were eliminated, leaving Gray as Chariot Group's sole director. As sole director, in 1991, Gray voted that Chariot Group pay $359,000 in

---

**1.** Plaintiffs and third-party defendants deny that Chariot Holdings wholly owns Chariot Plastics, but does not explain the basis for the denial. (Pls.' & TP Defs.' Rule 56.1 Counter–Statement ¶ 2). This is one of several instances where plaintiffs and third-party defendants oppose factual assertions made by defendants and third-party plaintiff without citing to evidentiary authority "because such citation would require Mr. Gray to waive his Fifth Amendment rights." (Id. at 2 n. 1).

Corporations may not assert the privilege against compulsory self-incrimination. S.E.C. v. First Jersey Securities, Inc., No. 85 Civ. 8585(RO), 1987 WL 8655, at *5 (S.D.N.Y. Mar. 26, 1987) (citing Bellis v. United States, 417 U.S. 85, 89–90, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974)). An officer's or directors' invocation of the Fifth Amendment is admissible as an adverse inference against the corporation. See id. (citing Brink's, Inc. v. City of New York, 717 F.2d 700 (2d Cir. 1983)).

Therefore, plaintiffs and third-party defendants may not invoke the Fifth Amendment, and Gray's assertion of the privilege warrants an adverse inference against plaintiffs and third-party defendants. To the extent that plaintiffs and third-party defendants move to strike the government's statement pursuant to Local Rule 56.1, that motion is denied. Plaintiffs' and third-party defendants' application to now be given the opportunity to submit support for their denials is also denied.

**2.** Chariot Group was originally incorporated under the name Sandusky Plastics, Inc. ("Sandusky"), which was a publicly traded Delaware corporation that owned operating subsidiaries, including Energy Savings Products, Inc. ("ESP"). It appears as though Sandusky began doing business as Chariot Group in 1987. Chariot Group entered into a cash-out merger with Summit Metals in 1995. Summit Metals, successor by merger to Chariot Group, Chariot Group, and Sandusky, are collectively referred as Chariot Group throughout this decision unless individually named.

management fees to Gray's wholly owned corporation Chariot Holdings. That same year, Chariot Group forgave and cancelled loans and advances that Chariot Group made to Gray and Chariot Holdings in the aggregate amount of $1,230,813.01. Further, Chariot Group paid Gray an annual salary of $200,000.

According to the government, from 1992 to 1994, Gray caused Chariot Group to cancel a $524,000 debt that he owed and to pay $4,613,140 in management fees to Chariot Holdings. It appears as though at least a part of these management fees were paid directly to Gray. The government submitted financial worksheets produced by Chariot Holdings that include explicit adjustments "for consulting fees paid by [Chariot Group] to [Chariot Holdings] but paid to R. Gray." (Cenawood Dec., Exh. M). The government contends, however, that Gray did not spend any time managing Chariot Group or its subsidiaries during this period that would justify such fees. (Benton Dec. ¶ 20).

After Gray signed the 1994 Tax Court decision, payments of management fees from Chariot Group to Chariot Holdings ceased. The government submitted evidence that the management fees were instead directed to other companies that Gray controlled, such as VDC Recovery, Inc.

The government alleges that Gray, to avoid collection of the consolidated tax group's outstanding tax liability, stripped the group of the operating companies ESP and B.F. Rich. On June 30, 1995, Chariot Group entered into an agreement with Homestar by which Chariot Group transferred to Homestar its entire ownership interest in the operating company ESP, which wholly owns the other operating company B.F. Rich. In exchange, Hallowell gave an unsecured $15 million promissory note to Chariot Group, no payments on which are due until August 1, 2000. Plaintiffs and third-party defendants claim that Homestar was not acting on its own behalf, but rather as nominee for Harcar, Inc. ("Harcar"). In any event, Gray appears to have represented all of the parties because Gray signed the sale and purchase agreement on behalf of both the seller Chariot Group and the buyer Homestar, Gray also

signed the promissory note on behalf of Hallowell, and Gray authorized the deal for Chariot Plastics as its majority stockholder. As chairman of Homestar, Gray then executed a certificate of ownership and merger that merged Homestar into ESP.

On August 7, 1995, facing shareholder derivative suits in state courts, Gray caused Chariot Group to enter into a cash-out merger with Summit Metals without notice or approval by the minority shareholders. The merger eliminated the minority shareholder's equity interest in exchange for promissory notes from a corporate obligor, which the government claims are worthless.

Further, the government submitted evidence that Gray has: (1) transferred Chariot Group corporate funds into his personal account (Benton Dec. ¶ 20, Exh. AL); (2) wired funds from a Chariot Holdings corporate account to his personal account and to the accounts of other companies he controls (id. ¶ 24, Exh. AM); (3) used Chariot Holdings corporate funds for improvements to his private residence (id. ¶ 25, Exh. AN); and (4) caused Chariot Holdings to make car payments for him (Cenawood Dec., Exh. N).

### D. Alleged Ethical Violations by Richardson

Plaintiffs and third-party defendants assert that the government has based its case on evidence obtained from Ambrose Richardson in violation of his ethical duties as counsel to plaintiffs, third-party defendants, and Gray personally.

Gray and Richardson, both attorneys, met while employed by the law firm Mudge Rose Gutherie & Alexander. From 1978–1987, Gray and Richardson were partners and practiced law together under the name Gray & Richardson. Beginning in 1983, however, Gray devoted less time to practicing law and more time to business activities. As Gray focused more on business, Richardson performed a variety of legal work for the corporate entities owned and controlled by Gray, including Chariot Holdings. After Gray & Richardson disbanded in 1987, Richardson formed McPheters & Richardson. Richardson's representation ended in 1991, with the

exception of certain collection matters not related to this action.

Plaintiffs and third-party defendants allege that as early as 1988 Richardson began making unlawful disclosures to the IRS regarding Chariot Holdings and other corporate entities in the consolidated tax group. Plaintiffs and third-party defendants further suggest that the IRS has agreed to pay Richardson a bounty upon successful collection of the outstanding tax debt. The government maintains that except for the location of the stock certificates eventually levied by the government, Richardson only provided the IRS with publicly available documents filed in state courts. The government denies that Richardson ever requested or that the government ever paid him a commission for information.

### E. *Prior Proceedings*

Chariot Plastics and Summit Metals commenced this action against the United States, the Commissioner of Internal Revenue, and Revenue Officer Lawrence Randall on June 14, 1996, asserting two causes of action in their complaint. The first cause of action is for wrongful levy pursuant to 26 U.S.C. § 7426. The second cause of action is to quiet title pursuant to 28 U.S.C. § 2410. Plaintiffs seek: (1) an injunction restraining the IRS from levying against, seizing, selling, or otherwise collecting plaintiffs' property; (2) an order directing the IRS to return any of plaintiffs' property already levied against or seized by the IRS; and (3) a declaration that the IRS has no right, title, interest, lien, claim, or assessment against any of plaintiffs' property.

Defendants filed counterclaims against plaintiffs on September 18, 1996, asserting five causes of action: (1) against Summit Metals for judgment on all of the assessments owed, by stipulation, by Chariot Holdings; (2) against Chariot Plastics, for judgment on tax assessments for the 1986 tax year owed, by stipulation, by Chariot Holdings; (3) against plaintiffs for foreclosure of tax liens on the basis that plaintiffs are liable for all outstanding tax liability, which may be satisfied by foreclosing on plaintiffs' properties and rights thereto; (4) against plaintiffs

for foreclosure of tax liens on the ground that plaintiffs and Chariot Holdings are nominees and alter egos of one another and that therefore their "nominally distinct corporate forms" should be disregarded; and (5) against Summit Metals for fraudulent conveyance pursuant to New York Debtor & Creditor Law §§ 270–281.

On September 30, 1996, the government filed a third-party complaint against Chariot Holdings, Hallowell, and Homestar, asserting three causes of action: (1) against Chariot Holdings for judgment on its assessed tax liabilities; (2) against third-party defendants for judgment on the assessments owed, by stipulation, by Chariot Holdings on the ground that plaintiffs and third-party defendants are nominees and alter egos of one another, and that therefore their "nominally distinct corporate forms" should be disregarded; and (3) against third-party defendants for fraudulent conveyance pursuant to New York Debtor & Creditor Law §§ 270–281.

The government seeks judgment against plaintiffs and third-party defendants for: (1) outstanding taxes, penalties, and interest; (2) a declaration that plaintiffs' and third-party defendants' assets are subject to valid and continuing tax liens and levies, and directing that the federal tax liens and levies be enforced and foreclosed upon plaintiffs' and third-party defendants' assets; (3) a declaration that certain transactions, described above, were fraudulent conveyances, and an order directing plaintiffs and third-party defendants to satisfy the outstanding tax liability with any assets and proceeds of assets, plus interest, from the allegedly fraudulent conveyances; and (4) costs and disbursements incurred in this action, including attorneys' fees.

These motions followed.

### *DISCUSSION*

The following issues are presented on the motions: (1) whether plaintiffs and third-party defendants are barred by the doctrines of res judicata and collateral estoppel from arguing that the government obtained information from Richardson in violation of his

ethical obligations and the attorney-client privilege; (2) whether judgment should be entered against Chariot Holdings pursuant to the stipulated 1994 Tax Court decision; (3) whether plaintiffs lack standing to maintain a wrongful levy action against the government; (4) whether the government's counterclaims against Chariot Plastics and Chariot Group are barred by the statute of limitations; (5) whether the government may pursue its claim that plaintiffs and third-party defendants Hallowell and ESP are liable for the outstanding assessments as nominees and alter egos of Chariot Holdings; and (6) whether plaintiffs' claims against the individual defendants should be dismissed because they are not proper defendants to a wrongful levy or quiet title action.

## A. Res Judicata and Collateral Estoppel

Plaintiffs and third-party defendants level a serious accusation against the government: that the basis for declaring the deficiency against Chariot Holdings and for obtaining the subject levies was information that the government knowingly and unlawfully obtained from Richardson in violation of his ethical duties and the attorney-client privilege. Purportedly, "the only way the Court can properly sanction the IRS for its use of such information" is by granting plaintiffs' motion for summary judgment and dismissing the government's counterclaims and third-party claims. (Pls.' & TP Defs.' Br. at 4–5). The government asserts that res judicata and collateral estoppel preclude plaintiffs and third-party defendants from advancing this argument because a court has already held that Richardson's assistance to the IRS did not violate client confidentiality. The government further contends that it did not in fact rely on any attorney-client privileges.

■ Res judicata and collateral estoppel are important doctrines that reduce the burden of litigation by precluding multiple lawsuits, conserving judicial resources, and encouraging reliance on adjudication by preventing inconsistent decisions. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Res judicata prevents a party or its privies from relitigating issues that were or could have been raised in a prior action once a final judgment has been rendered in that action. *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); *McCurry,* 449 U.S. at 94, 101 S.Ct. 411. Under collateral estoppel, a party is precluded from relitigating in a later case an issue that was clearly raised and decided in an earlier action. *McCurry,* 449 U.S. at 94, 101 S.Ct. 411; *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1457 (2d Cir.1995).

■ Federal courts are required to give preclusive effect to state court judgments whenever a court of that state would have done so. *McCurry,* 449 U.S. at 96, 101 S.Ct. 411; *Huron Holding Corp. v. Lincoln Mine Operating Co.,* 312 U.S. 183, 193, 61 S.Ct. 513, 85 L.Ed. 725 (1941); *Brooks v. Giuliani,* 84 F.3d 1454, 1463 (2d Cir.1996). Under New York law, an earlier litigated claim bars a later claim arising out of the same factual grouping even if the later claim is based on different legal theories or seeks dissimilar or additional relief. *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 429 N.E.2d 1158 (1981).

In *Gray v. Richardson,* Gray sought to enjoin Richardson and his law firm from engaging in a course of conduct adverse to the interests of their former clients and requiring defendants to retain client confidences. *Gray v. Richardson,* No. 124969/95, slip op. at 1 (Sup.Ct. N.Y. County Mar. 24, 1997). Just as plaintiffs and third-party defendants here argue that Richardson violated client confidences by assisting the IRS, so too did Gray and Summit Metals argue in the prior state court case. *Id.* at 3. The court in *Gray* held:

In simple terms plaintiffs have failed to demonstrate the adversity of the interest Richardson represented. While Gray contends that Richardson handled "tax" matters for him, the detailed billing belies that. *There is no showing that [Richardson's] efforts to assist the Internal Revenue Service* in collecting the over $7 million that Gray and his corporations concededly owe *has anything to*

*do with Richardson's prior representation of Gray or the corporations.*
*Id.* (emphasis added). The court granted summary judgment in favor of Richardson and dismissed the complaint. *Id.* at 4.

Plaintiffs and third-party defendants argue that, despite the court's clear statement in *Gray,* the prior action should not preclude them from arguing here that Richardson violated his ethical duties and the attorney-client privilege because: (1) there is no identity between the issues in this action and those raised in the prior action; (2) the *Gray* court never made a factual determination entitled to collateral estoppel effect; and (3) new evidence is presented in this case that was not available when *Gray* was decided.

■ The Court is unpersuaded by this effort to draw distinctions between the issue raised in the prior case and the issue raised here. Plaintiffs and third-party defendants frame the issues to suit their purposes as follows: (1) that the issue in the state case was "whether plaintiffs could show sufficient cause for injunctive relief against Mr. Richardson"; and (2) that the issue in this case is "whether [Richardson's] conduct—and that of the IRS—is sufficiently egregious to warrant judgment in plaintiffs' and third-party defendants' favor." (Pls.' & TP Defs.' Reply Mem. at 20). One of the issues raised in the prior case was, however, whether the assistance Richardson provided to the IRS was related to Richardson's prior representation of Gray or the corporations—the same issue raised in this case. This issue was actually litigated and determined in the context of plaintiffs seeking to enjoin Richardson from assisting the IRS.

In addressing the state court's explicit language quoted above, plaintiffs and third-party defendants make conclusory statements. According to plaintiffs and third-party defendants, the state court's finding that Richardson's assisting the IRS was unrelated to his prior representation of Gray or the corporations "is a far cry from a factual determination that disclosures did not ... take place." (*Id.* at 21). No basis to support this claim is asserted. Plaintiffs and third-party defendants also challenge the state court's finding that Richardson's representation ended in

1991. The court's determinations, however, were made on a motion for summary judgment "where the burden [was] on the parties to assemble, lay bare and reveal their proof in admissible form." *Gray,* slip op. at 2. In granting defendants' motion for summary judgment, the court necessarily concluded that there were no issues of material fact and that its factual determinations were the only ones a reasonable factfinder could reach.

Plaintiffs and third-party defendants further allege that new evidence is available that the state court did not consider. The events in question, however, took place years ago and, in any event, the Court is not persuaded that any of the allegedly new evidence is sufficient to make collateral estoppel inappropriate.

■ Further, res judicata and collateral estoppel apply once final judgment is entered in a case, even while an appeal from that judgment is pending. *Petrella v. Siegel,* 843 F.2d 87, 90 (2d Cir.1988) (citing *Huron Holding Corp. v. Lincoln Mine Operating Co.,* 312 U.S. 183, 189, 61 S.Ct. 513, 85 L.Ed. 725 (1941)). Therefore, *Gray* has preclusive effect even though an appeal is pending before New York's First Department.

Accordingly, res judicata and collateral estoppel bar plaintiffs and third-party defendants from alleging that Richardson assisted the government in violation of his ethical obligations and the attorney-client privilege.

**B. *Chariot Holdings***

■ The issue presented is whether the government is entitled to have the assessments against Chariot Holdings reduced to judgment.

■ Once a taxpayer has been assessed, the government is entitled to have the assessment reduced to judgment unless the taxpayer overcomes the presumption enjoyed by the IRS that the assessment is correct. *See* 26 U.S.C. § 7402(a); *United States v. Rodgers,* 461 U.S. 677, 682, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983); *United States v. Rindskopf,* 105 U.S. 418, 15 Otto 418, 26 L.Ed. 1131 (1881); *DeLorenzo v. United States,* 555 F.2d 27, 29 (2d Cir.1977).

To defeat a motion for summary judgment, the taxpayer must not only show that the assessment is incorrect, but it must also prove the correct amount of the tax. *See United States v. Janis*, 428 U.S. 433, 440–41, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *O'Callaghan v. United States*, 943 F.Supp. 320, 327 (S.D.N.Y.1996).

Chariot Holdings did not file a memorandum of law in opposition to the government's motion. Instead, Chariot Holdings submitted an affidavit claiming that it intends to challenge the underlying deficiency by moving to vacate the 1994 Tax Court decision. (Predmore Aff. of May 28, 1998 ¶ 3). Chariot Holdings has failed to overcome the presumption in favor of the government because it did not prove that the assessment is incorrect or show the correct amount of tax. Accordingly, the government is entitled to summary judgment in this respect.

## C. *Chariot Plastics and Chariot Group*

Two issues are presented by the motions regarding plaintiffs: (1) whether they lack standing to maintain a wrongful levy action against the government; and (2) whether the statute of limitations bars the government's counterclaims.

### 1. *Standing*

■ Whether plaintiffs lack standing to maintain the wrongful levy action hinges on whether they are taxpayers liable for the deficiencies assessed for the tax years that they were part of the consolidated tax group.

Taxpayers lack standing to bring a wrongful levy action under 26 U.S.C. § 7426. *See* 26 U.S.C. § 7426(a)(1) ("[A]ny person (other than the person against whom is assessed the tax out of which such levy arose)" may bring a civil action against the United States to challenge a levy.); *Frierdich v. United States*, 985 F.2d 379, 380, 382–83 (7th Cir. 1993).

The option for affiliated corporations to file a consolidated tax return is considered a privilege. 26 U.S.C. § 1501. By filing a consolidated tax return, members of the consolidated group agree to be bound by all of the consolidated return regulations. *Id.*

Such regulations are intended "to prevent avoidance of [a consolidated group's] tax liability." *Id.* § 1502. According to the regulations: "[T]he common parent and each subsidiary which was a member of the group during any part of the consolidated return year shall be severally liable for the tax for such year ...." 26 C.F.R. § 1.1506–6(a); *see United States v. Williams*, 959 F.Supp. 210, 212 (S.D.N.Y.1997).

■ Plaintiffs note that IRS settlement agreements are governed by general principles of contract law. *See Goldman v. Commissioner of Internal Revenue*, 39 F.3d 402 (2d Cir.1994). Plaintiffs assert that they are not taxpayers liable for the tax debt because they were not parties to the Tax Court settlement. The cases on which plaintiffs rely, however, are contract cases not related to tax, let alone the tax of a consolidated group. *See, e.g., Mellencamp v. Riva Music Ltd.*, 698 F.Supp. 1154 (S.D.N.Y.1988) (songwriter sues recording companies); *Stratton Group, Ltd. v. Sprayregen*, 458 F.Supp. 1216 (S.D.N.Y.1978) (company sues its officers and directors). Plaintiffs further argue that even if they would have been liable for the tax by virtue of their being part of the consolidated tax group, the government has waived or compromised any claim against them by failing to include them in the settlement.

■ Plaintiffs have failed to show that the specific tax regulation making members of a consolidated tax group severally liable for the tax of the consolidated tax year should not apply when the parent corporation reaches a settlement agreement with the IRS. To hold otherwise would thwart the purpose of the tax regulation to prevent consolidated group members from avoiding tax liability. *See* 26 U.S.C. § 1502.

According to the tax regulations, the common parent is the sole agent for each subsidiary in the group. 26 C.F.R. § 1.1502–77(a). Plaintiffs are bound by the stipulated Tax Court decision because Chariot Holdings executed the settlement on their behalf as their agent. Further, as a policy matter, corporate subsidiaries should not enjoy the benefit of having the parent file a consolidated return on their behalf and then claim that the

parent does not represent their interests in a settlement for those taxes. Plaintiffs are therefore severally liable for the assessments of the tax years that they were included in the consolidated group. Accordingly, plaintiffs are taxpayers and lack standing to maintain the wrongful levy claim, which is hereby dismissed.

### 2. Statute of Limitations

■ Whether the three-year statute of limitations within which an assessment must be made applies barring the government's counterclaims against plaintiffs depends on whether the consolidated returns were false or fraudulent, in which case an unlimited period for assessment exists.

Taxes must ordinarily be assessed within three years after a return is filed. 26 U.S.C. § 6501. An exception to the three-year statute of limitations exists for "a false or fraudulent return [filed] with the intent to evade tax." *Id.* § 6501(c)(1). In cases of fraudulent returns, there is no limit on the time in which an assessment must be made. *Id.; see Badaracco v. Commissioner of Internal Revenue*, 464 U.S. 386, 394, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984); *Lowy v. Commissioner of Internal Revenue*, 288 F.2d 517, 519–20 (2d Cir.1961).

Plaintiffs argue that the government must prove that the returns were fraudulent before the exception to the statute of limitations applies. While it is true that the Tax Court's decision did not set out evidence of fraud, the fraud exception still applies because Chariot Holdings, on behalf of the consolidated group, stipulated to the fraud penalties asserted under 26 U.S.C. § 6653. By explicitly agreeing to fraud penalties, Chariot Holdings conceded, at least implicitly, that it was liable for fraud. The government's counterclaims against plaintiffs are therefore not barred by the statute of limitations.

### D. Hallowell and ESP

■ The issue presented is whether the government's claim that plaintiffs and third-party defendants are nominees and alter egos of one another must be dismissed.

The government has clearly and adequately identified the alleged fraudulent conduct. An issue of fact exists as to whether piercing the corporate veil and permitting the government to pursue its collection efforts against Hallowell and ESP is appropriate. Accordingly, plaintiffs' and third-party defendants' motion is denied.

### E. Proper Defendants

■ The government argues that the complaint should be dismissed in its entirety with respect to the Commissioner of Internal Revenue and Revenue Officer Lawrence Randall because they are not proper defendants to either a wrongful title or quiet title action. Plaintiffs and third-party defendants do not dispute this point or offer argument in opposition.

Under 26 U.S.C. § 7426, a person other than the taxpayer may bring an action for wrongful levy. The statute limits a plaintiff's right, however, to suits against the United States. "No action may be maintained against any officer or employee of the United States." 26 U.S.C. § 7426(d); *see, e.g., McLamb v. United States Dep't of Treasury*, 858 F.Supp. 1042, 1043 (S.D.Cal.1994) (holding that the United States was the only proper § 7426 defendant).

Likewise, the quiet title action under 28 U.S.C. § 2410 is permitted only against the United States, not against individuals. *See* 28 U.S.C. § 2410 ("[T]he United States may be named a party in any civil action ... to quiet title to ... real or personal property on which the United States has or claims a mortgage or other lien."); *see, e.g., Labry v. Internal Revenue Service*, 940 F.Supp. 148, 149 (E.D.La.1996) (dismissing action against the IRS because the United States was the only proper § 2410 defendant).

Accordingly, plaintiffs' complaint against the individual defendants is dismissed.

### CONCLUSION

For the reasons set forth above, plaintiffs' and third-party defendants' motions are denied in all respects, and the government's motion is granted in all respects. Both of plaintiffs' claims are hereby dismissed with

prejudice.[3] The only remaining claims are the government's fraudulent conveyance claims against Summit Metals and third-party defendants and the government's alter-ego claim against third-party defendants.

The government shall submit a proposed judgment with respect to the assessments against Chariot Holdings, Summit Metals as successor by merger to Chariot Group, and Chariot Plastics by December 15, 1998. The parties shall appear for a pretrial conference on December 18, 1998 at 11:00 A.M. in Courtroom 11A at 500 Pearl Street.

SO ORDERED.

---

**3.** Although the parties did not brief the issue, it is clear that plaintiffs' quiet title action also must be dismissed. As discussed above, plaintiffs are taxpayers severally liable for the tax years during which they were included in the consolidated group. Accordingly, the government is entitled to judgment against Chariot Group for all three tax years and against Chariot Plastics for the 1986 tax year.